UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON

| | |
|---|---|
| **TERESA HOSKINS,** | **CIVIL ACTION NO. 5:13-198-KKC** |
|     **Plaintiff,** | |
| **V.** | **OPINION AND ORDER** |
| **THE BOARD OF EDUCATION OF LINCOLN COUNTY, et al.,** | |
|     **Defendants.** | |

This matter is before the Court on a motion for summary judgment filed by Defendants, the Board of Education of Lincoln County and School Board Members Jim Kelley, Tom Blankenship, Tim Jackson, Denny Hogue, and Theresa Long (collectively "LCBOE"). (DE 13). Plaintiff Teresa Hoskins filed a complaint alleging that the defendants retaliated against her for taking leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq*. The LCBOE asserts that the self-care portion of the FMLA is unconstitutional as applied to a state agency employer and that Hoskins has failed to demonstrate retaliation. The LCBOE contends that Hoskins's contract was not renewed because of mandatory reductions in staff and her relatively low student performance data. Hoskins failed to articulate any facts indicating that the LCBOE's non-retaliatory reason for their employment action was a pretext to mask a retaliatory motive. Therefore, the Court will grant the Defendants' motion for summary judgment.[1]

I.

Hoskins was employed by the LCBOE as a certified preschool teacher beginning in 2009. Hoskins worked under a "limited contract" that was only valid for one school year

---

[1] The Court expressly reserves judgment regarding the LCBOE's constitutional argument because Hoskins has failed to state a claim upon which relief can be granted.

because she did not have "tenure."[2] Hoskins immediate supervisors included Jane Berry, the Early Childhood Preschool Program Manager, and Karen Hatter, the Superintendent of the Lincoln County School System ("LCSS").

Prior to the 2011–12 school year, Superintendent Hatter sent a notice to all LCSS employees stating that any absence must be authorized and informing all employees of the resources that describe "the various types of leave available and the qualifications for each." (DE 13-2 at 21). Also before the 2011–12 school year, Berry sent Hoskins a letter concerning her numerous absences during the 2010–11 school year. In the letter, Berry expressed concern about Hoskins's near 20% absenteeism rate but acknowledged that the issue could be addressed with a "doctor's statements or an official leave request." (DE 13-2 at 49).

A few months into the 2011–12 school year, Superintendent Hatter requested a district-wide report concerning employee attendance. (DE 13-2 at 6–7). Superintendent Hatter then sent letters to all employees with unauthorized absences, including Hoskins. (DE 13-2 at 7). Superintendent Hatter's letter, sent December 9, 2011, referenced Hoskins's twelve absences and suggested that she investigate whether she qualified for FMLA leave. (DE 13-2 at 21–22). On December 12, 2011, Hoskins filed a request for FMLA leave which the LCSS approved on December 27, 2011. (DE 13-2 at 23). Hoskins took leave as necessary, informed the LCSS of her absences as soon as possible, and was not discouraged from applying for, and later using, FMLA leave. (DE 13-2 at 56–57). When Hoskins used FMLA leave, she provided her lesson plan to her assistant teacher and the substitute teacher, and both teachers implemented the lesson plan as if Hoskins was present. (*See* DE 13-2 at 57). Hoskins also acknowledged that the LCSS routinely used the same substitute teacher

---

[2] Kentucky law requires all non-tenured teachers work under limited, one-year contracts. KRS § 161.730.

because that teacher was familiar with Hoskins's class and "knew what to do." (DE 13-2 at 57).

In May 2012, all non-tenured LCSS teachers, including Hoskins, received notices that their contracts would not be renewed for the following school year, 2012–13. (DE 1-2 at 4; DE 13-2 at 12). In her deposition, Superintendent Hatter noted that this practice was common because school budgets were normally not finalized before school districts were required to notify non-tenured teachers that their contracts would not be renewed. Specifically, KRS § 161.750 requires that notices of non-renewal be provided to non-tenured teachers no later than May 15 of the school year during which the contract was in effect. Therefore, schools routinely notified non-tenured teachers that their contracts would not be renewed only to rehire them in the summer when or if sufficient funds become available. (DE 13-2 at 9–11).

Unfortunately for Hoskins, the LCSS preschool program did not receive sufficient funds to maintain its full complement of preschool teachers for the 2012–13 school year, and the preschool program "had to cut two teachers." (DE 13-2 at 43). The preschool met this budgetary constraint through one teacher's retirement and the non-renewal of Hoskins's contract. (DE 13-3 at 3).

Hoskins contends that her contract was not renewed because she took FMLA leave. (DE 13-2 at 59). In support of this contention, Hoskins asserts that Berry told her daughter, over the phone, and her husband, in the parking lot after a Board of Education meeting, that Hoskins's contract would not be renewed because of her absences. (DE 13-2 at 46, 59).

The LCBOE states, and Hoskins does not contest, that the LCSS measures teacher effectiveness through student performance data, as measured by standardized assessments. (DE 13-2 at 36; DE 13-3 at 3). The preschool program provides kindergarten readiness

3

assessments in the fall and spring semester, and the LCSS compares the students' fall and spring scores to determine the students' gains. (DE 13-2 at 36). The students' gains are compiled by classroom teacher and a report compares the "total percentage gain" for each classroom teacher. (DE 13-2 at 24–26). Hoskins's total percentage gain was third to last. (DE 13-2 at 24–26). The second-to-last teacher retired, and the teacher with the lowest total percentage gain had tenure. Therefore, the LCBOE declares that Hoskins contracted was not renewed because the department had to reduce the number of classrooms and Hoskins was the non-tenured teacher whose students had the lowest total percentage gain. (DE 13-3 at 3).

## II.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact, and the movant may meet this burden by establishing the lack of evidence supporting one or more essential elements of the non-movant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986). Once the moving party satisfies its burden, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotations omitted). Ultimately, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

In evaluating the evidence, the court draws all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"A mere scintilla of evidence, however, is not enough for the non-moving party to withstand summary judgment." *La Quinta Corp. v. Heartland Properties LLC*, 603 F.3d 327, 335 (6th Cir. 2010) (internal quotations omitted).

### III.

The FMLA entitles eligible employees "to a total of 12 workweeks of leave during any 12-month period for . . . a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The FMLA prohibits covered employers from retaliating against an employee for exercising her right to FMLA leave. 29 U.S.C. § 2615(a)(2).

Without direct evidence of retaliation, the Court must apply the three-step burden-shifting framework delineated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 427 (6th Cir. 2014); *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001). First, the employee has the burden of demonstrating a prima facie retaliation case; second, the burden shifts to the employer to present a "legitimate, non-discriminatory" reason for the adverse employment decision; and third, the burden shifts back to the employee to establish that the employer's stated reason is pretextual. *Demyanovich*, 747 F.3d at 427. "Although the burdens of production shift, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

An employee demonstrates a prima facie retaliation case by showing that "(1) [s]he engaged in protected activity, (2) h[er] employer was aware of the protected activity, (3) [s]he was subject to an adverse employment action, and (4) there was a causal nexus

5

between the protected activity and the adverse employment action." *Demyanovich*, 747 F.3d at 433.

An employer may satisfy its burden by presenting facts that indicate that the adverse employment decision was based upon a legitimate business justification. *See, e.g.*, *Blosser v. AK Steel Corp.*, 520 F. App'x 359, 367 (6th Cir. 2013) ("The economic recession of 2008 forced AK Steel to implement company-wide involuntary layoffs, and Blosser's position was eliminated as part of that reduction in force. Blosser was selected for termination using the same criteria used to evaluate every employee: seniority, work performance, and uniqueness of skills."); *Skrjanc*, 272 F.3d at 312, 315 (holding that an adverse employment decision against a positively-reviewed employee may present a legitimate, non-discriminatory rationale if the decision is based upon neutral criteria and bounded by economic realities).

An employee establishes that the employer's stated reason is pretextual if the reason "(1) ha[s] no basis in fact; (2) did not actually motivate the action; or (3) w[as] insufficient to warrant the action." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012). Establishing pretext, however, is not formulaic. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). Rather, it is a commonsense inquiry: did "the employer ma[k]e up its stated reason to conceal intentional discrimination[?]" *Id.* "At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation." *Id.*

Here, Hoskins contends that she demonstrated a prima facie retaliation case because she alleged that her absences during the 2011–12 school year motivated the LCBOE's employment decision. The LCBOE concedes the first and second elements but contests the third and fourth elements of Hoskins's prima facie case. It is unnecessary, however, for the

Court to analyze Hoskins's prima facie burden because it is clear from the record that the LCBOE had a legitimate, nondiscriminatory reason to not renew Hoskins's contract. Moreover, Hoskins has not demonstrated that the LCBOE's reason was a pretext for unlawful discrimination.

The LCBOE satisfied its burden to present a legitimate business justification for its employment action. Reduced funding forced the preschool department to reduce its staff by two teachers. One teacher retired. The LCBOE then used identical criteria to evaluate the remaining teachers' performance: tenure and total percentage gain. *See Blosser*, 520 F. App'x at 367. Tenure and total percentage gain are neutral criteria, *see Skrjanc*, 272 F.3d at 315, and, of the non-tenured teachers, Hoskins's students had the lowest total percentage gain. Accordingly, the LCBOE decided not to renew Hoskins's contract.

Hoskins never asserts that the LCBOE's justification was pretextual. Nonetheless, the Court will consider her claim that Berry told Hoskins's family members that her contract would not be renewed because of her absences as possible evidence of pretext. Taken as true, however, the alleged statement does not indicate that Hoskins's third-to-last total percentage gain did not actually motivate the LCBOE's decision. Hoskins never argues that the LCSS does not measure teacher effectiveness through student performance data. She does not contend that the kindergarten readiness scores and the associated total percentage gain are wrong or fabricated, and she does not claim that any other non-tenured teachers had worse student performance data. Hoskins further concedes that the LCSS made appropriate accommodations when she took leave, even providing the same qualified substitute to encourage classroom performance. Hoskins has not presented any evidence from which a jury could reasonably doubt the LCBOE's justification.

Hoskins claims that the non-renewal of her contract was retaliatory because she had not taken FMLA leave before the 2011–12 school year. This, however, is a classic example of the logical fallacy of *post hoc ergo propter hoc*, i.e., "after this, therefore because of this." Black's Law Dictionary 1355 (10th ed. 2014) ("The logical fallacy of assuming that a causal relationship exists when acts or events are merely sequential."). Hoskins's timeline is correct, but simply because her contract was not renewed *after* she took FMLA leave does not mean that her contract was not renewed *because* she took FMLA leave.

## IV.

The record shows that Hoskins's student performance data lagged behind all other non-tenured teachers. It is also clear that the LCSS had to reduce the size of its preschool staff. There is *no* evidence that the LCBOE conjured data to "conceal intentional discrimination."

Accordingly, the Court hereby **ORDERS** as follows:

1. Defendants' motion for summary judgment (DE 13) is **GRANTED**; and

2. A judgment consistent with this Opinion and Order will be entered contemporaneously.

Dated this 6th day of November, 2014.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY